650 So.2d 517 (1995)
Ronald GAMBRELL
v.
Iris GAMBRELL.
No. 93-CA-00564-SCT.
Supreme Court of Mississippi.
February 16, 1995.
Dempsey M. Levi, Levi & Denham, Ocean Springs, for appellant.
Patti C. Golden, Biloxi, for appellee.
En Banc.
McRAE, Justice, for the Court:
Ronald Gambrell appeals a May 13, 1993 order of the Jackson County Chancery Court awarding Iris Gambrell alimony, attorney fees and child support. Based on our decisions in Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994) and Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), we find that the chancellor failed to consider all awards together, resulting in a less than fair resolution of the parties' financial relationship. Accordingly, we reverse and remand for reconsideration of alimony, attorney fees and child support in light of the stipulated division of marital property entered into by the parties.

I.
Ronald and Iris Gambrell were married on February 14, 1969 and separated on October 30, 1990. They are the parents of two daughters, ages nineteen and fifteen at the time of trial. In May, 1992, Iris was granted a divorce on the ground of adultery.
Ronald, a pilot for Southwest Airlines, joined the military when the couple married. He served for nine years of active duty and for twelve years in the Air Force Reserves. Iris taught high school for the first two and a half years of the marriage, until the couple moved to Guam. After the couple's two daughters were born, Iris managed the household, raised the children, and managed the rental properties accumulated during the course of the marriage. About five years before the parties separated, Ronald obtained the various licenses necessary to become a commercial pilot and began his present career with Southwest Airlines.
Seeking a tax write-off, the couple purchased a dancewear retail shop, All That Jazz, for $4545.00 about two and one-half years before they separated. Iris ran the *519 shop, which was open only twenty hours a week; the couple's older daughter, Kerry, worked there part-time while in college. Prior to opening All That Jazz, Iris had worked for Donna's School of Dance for eight years, earning about $200.00 a month.
Iris, who was 45 years old at the time of divorce, has a Bachelor's degree. At the time of these proceedings, she was taking computer science courses to obtain teaching recertification in that area. She hoped to pursue a Masters degree to increase her earnings potential as an educator without requiring any additional years of teaching experience. She estimates that this will take her three years.
Ronald was 46 years old at the time of the divorce. As a pilot for Southwest Airlines, his monthly gross income exceeds $6,664.93.[1] His May, 1991 Financial Disclosure Statement indicated that after pension plan deductions and a $600.00 per month contribution to the children's college fund, he had a net monthly income of $3,113.44. He earned additional gross income from the United States Air Force Reserves of $544.48 per month.
By stipulation, the parties effected a division of their marital assets and settled many of the attendant financial and child custody matters. It was agreed that Iris would be entitled to one-half of Ronald's military retirement pay for the years they lived in community property states and that the court should determine the percentage to which she was entitled for the remaining years. Iris received her doubloon collection, the Honda Accord she had been driving during the marriage, one-half of the notes due on two second mortgages held jointly by the parties (Iris' half provides income of $150.00 a month), the marital home along with its mortgage payments, and a rental house, along with its $205.00 monthly mortgage payment and the right to collect the $415.00 monthly rent thereon; and one-half interest in All That Jazz. In addition, Iris had $400.00 in a checking account, an IRA with an approximate balance of $6,500.00, and approximately $3,500.00 cash, proceeds from a CD she cashed at the time of the parties' separation in order to pay living expenses. It was stipulated that nineteen year old Kerry elected to live with her mother.
Ronald received, by stipulation, a Porsche valued at $6,000.00, a 1977 van, and a Honda CRX; one-half of the notes due on the two second mortgages held by the parties ($150.00 a month); his coin collection; one-half interest in All That Jazz; and two rental houses, along with their monthly mortgage notes of $465.00 and $174.00. Ronald planned to use one of the houses as his residence; the second provided him with a monthly rental income of $270.00. In addition, Ronald had a $5,957.75 Southwest Airlines profit sharing account; savings of $2,668; a $20,000.00 401K plan; a $12,000.00 IRA; and control over $5,756.00 deposited with the Keesler Federal Credit Union, which he said was for the children's college expenses.[2] A flexible custody arrangement was requested for fifteen year old Tracey, who chose to live with her father.
As agreed to by the parties, determination of the amount of periodic alimony to which Iris would be entitled was left to the Chancellor. He awarded her $1,750.00 monthly alimony, to increase by $100.00 a month in April, 1993, when she would no longer be eligible for dependent coverage on Ronald's medical insurance. Ronald was further obligated to provide Iris with $500.00 monthly child support for Kerry, to increase by $400.00 a month should Tracey decide to live with Iris; one-half of his $20,000.00 401K plan, based on its value thirty days from the date of the chancellor's order; one-half of the value of his $5,957.75 Southwest Airlines profit sharing account as of January 1, 1992;[3] 45% of his military retirement income, acquired during the course of the marriage; one-fourth or $3,750.00 of his IRA *520 accumulated during the course of the marriage; most of the household furnishings; and one-half of any 1990 or 1991 federal or state income tax refund Ronald received.
Ronald further was ordered to maintain medical insurance on his children; to pay for both children's four-year college degrees; and to maintain Iris as a dependent on his medical insurance for one year. Ronald was awarded all of his Southwest Airlines Credit Union accounts (approximately $2,200.00); and some furnishings from the former marital dwelling. He was allowed to claim both children as income tax deductions for 1990, 1991, 1992, and 1993. After 1993, Iris could claim Kerry if she is still eligible as a dependent and Tracey could be claimed by whomever has primary custody. Ronald was also ordered to pay Iris' attorney fees in the amount of $7,431.24 and all court costs.

II.
Recently this Court adopted the principle of equitable distribution, wherein assets "acquired or accumulated during the course of the marriage are marital assets and are subject to distribution by the chancellor." Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss. 1994). We acknowledged in Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994) that a recognized goal of the equitable distribution of assets is "not only a fair division based upon the facts of the case, but also an attempt to finalize the division of assets and conclude the parties' legal relationship, leaving them in a self sufficient state ..." Id. at 929. In providing for the division of many of their marital assets  and liabilities  by stipulation, Ronald and Iris effected what they envisioned as an equitable division of their property. We find, however, that in determining the amount of periodic alimony and child support as required by the stipulation, the chancellor erred in failing to view the issues of alimony, child support and attorneys fees in light of the division of property accomplished by the stipulation. In Ferguson, we emphasized the need for the chancellor to consider all awards together so that a fair and equitable end to the marital relationship might be achieved:
All property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together. "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore where one expands, the other must recede." LaRue [v. LaRue], 172 W. Va. 158, 304 S.E.2d [312] at 334 (1983) (Neely, J., concurring). Thus the chancellor may divide marital assets, real and personal, as well as periodic and/or lump sum alimony, as equity demands.
639 So.2d at 929. In this case, equity demands that the chancellor revisit the areas of periodic alimony, attorney fees and child support.

Periodic Alimony
The stipulation entered by the parties required the chancellor to determine the amount of periodic alimony to which Iris was entitled. In Johnson v. Johnson, 650 So.2d 1281 (Miss. 1994) (not yet reported), this Court addressed the role of alimony in those cases where an equitable distribution of the marital assets had been effected. Judge Prather, writing for the Court, stated:
If there are sufficient marital assets which, when equitably divided and considered with each spouse's nonmarital assets, will adequately provide for both parties, no more need be done. If the situation is such that an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party, then alimony based on the value of the nonmarital assets should be considered. [footnote omitted]. This process does not require divestiture of inherited or gift-acquired nonmarital property.
Johnson, 650 So.2d at 1287.
Ronald and Iris Gambrell, through their stipulations, effected an equitable division of the property acquired during the marriage. In addition, the chancellor further ordered Ronald to pay Iris an additional $3,750.00, one quarter of the value of his IRA plan, to balance the parties' IRA savings. He further provided each party with the opportunity *521 to buy the other's half interest in All That Jazz for $3000.00, requiring the business to be sold and the assets equally divided, after payment of debt, if neither desired to purchase.
The stipulation made by the parties expressly provided that Iris would receive alimony. Thus, the chancellor correctly found that she was entitled to alimony. However, in light of our decision in Ferguson, and the division of assets made between the parties by stipulation as well as pursuant to the chancellor's order, we find the amount of the award to be excessive. Determining that Ronald's net monthly salary (after "maximum mandatory deductions") was $5,117.88, in contrast to Ronald's calculation of a net monthly income of $3,113.44 (including pension plan contributions and $600.00 per month toward the children's college fund), and weighing that against Iris' "reasonable" monthly expenses of $2,537.00, $500.00 of which was directly attributable to Kerry's support, the chancellor awarded Iris monthly alimony of $1750.00, to increase by $100.00 after one year, when she would no longer be eligible as a dependent under Ronald's insurance plan. In addition, Ronald was ordered to pay $500.00 child support for Kerry. It appears from these figures that the chancellor did not take into consideration the extent of the assets awarded to Iris and the income therefrom when determining Ronald's supplemental financial responsibilities. Accordingly, we reverse and remand for reconsideration of the alimony award in light of the division of assets between the parties.

Attorney Fees
Ronald further was ordered to pay Iris' attorney fees in the amount of $7,431.24, eighty percent of the $9,289.05 in fees she submitted. He contends that Iris is able to pay those fees and thus, that the chancellor erred in making the award. Generally, the award of attorney fees is not appropriate in divorce cases unless the party requesting the award has established an inability to pay. Dunn v. Dunn, 609 So.2d 1277, 1287 (Miss. 1992). Although Iris stated that she was unable to pay her attorney fees, the Chancellor made no such finding in his extensive Conclusions of Law and Findings of Fact, determining only that the fees were reasonable in light of the fact "that the litigation has been protracted and difficult." Thus the chancellor abused his discretion in making the award of attorney fees without a finding that Iris was unable to pay. Johnson, 650 So.2d at 1288-89; McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). Accordingly, the award of attorney fees is reversed for review upon remand consistent with our holdings.

Child Support
In Ferguson, we recognized that "[a]ll property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together." Id. at 929 (emphasis added). The parties entered a general stipulation that Ronald would pay for each of the two daughter's four year college education. The source of the funds was left to the Court's resolution. Under the terms of the final decree, Ronald was ordered to pay $500.00 per month child support for nineteen year old Kerry and in the event fifteen year old Tracey elected to move in with her mother, an additional $400.00 per month support. He, however, was given no credit for his expenditures on Tracey, who had chosen to live with him. He was further ordered to pay all of Kerry's college expenses, including provision of reliable transportation, drawing first from accounts established for the girls at the Keesler Federal Credit Union when they were young children. In addition, he was required to provide medical insurance for both daughters as well as to maintain a $100,000.00 life insurance policy with the girls as beneficiaries until the Tracey, the younger daughter, finished college. We recall that the chancellor has no authority to order post-majority support beyond that specifically contracted by the parties. Crow v. Crow, 622 So.2d 1226, 1230 (Miss. 1993) (allowing post-majority support to the extent that very specific provisions had been made by contract incorporated into the divorce decree). Accordingly, considering Ferguson's command that child support be considered together with other financial aspects of the termination of the marital relationship, and that there exist mutual *522 obligations for child support, we reverse the chancellor's order for reconsideration in light of Ronald's total income and obligations and Iris' ability to contribute to her daughters' support and education.

CONCLUSION
Our decisions in Ferguson and Hemsley require that when the equitable distribution of property acquired during the marriage is accomplished, the resultant division of assets and liabilities must be factored into the determination of other financial matters such as alimony and child support. We find that the chancellor's order fails to take into consideration the parties' stipulated division of assets, placing a disproportionate burden of financial responsibilities on Ronald without regard for Iris' potential for self-sufficiency. Accordingly, we reverse and remand for reconsideration of the matters of alimony, attorney fees and child support.
REVERSED AND REMANDED.
HAWKINS, C.J., DAN M. LEE, P.J., and SULLIVAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
PRATHER, P.J., dissents with separate written opinion joined by PITTMAN and SMITH, JJ.
PRATHER, Presiding Justice, dissenting:

I. INTRODUCTION
The parties to this appeal, who were married for over twenty-one years prior to their divorce, effected a division of many of their marital assets, as well as settled other financial matters and child custody, by stipulation. They then requested that the chancellor resolve certain issues. Because the majority reverses and remands what are, in my view, reasonable and proper awards of periodic alimony, child support, and attorney fees, I must dissent. This chancellor's result corresponds with that which would be reached by application of the factors directed by Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994), and Johnson v. Johnson, 650 So.2d 1281 (Miss. 1994) and no remand is needed.

II. THE FACTS
At the time this marriage of over twenty-one years was dissolved by divorce, Iris was 45 years old while Ronald was 46 years old. Iris was pursuing a Masters degree in order to re-enter teaching, the profession she had left 19 years earlier to devote her full-time energies to being a wife and mother. Although Iris ran All That Jazz, the dancewear retail shop the couple purchased for a tax write-off about four years before the divorce, she had received only one pay check, in the amount of $200.00, in the two and one-half years from the time of purchase to the time the parties separated. Ronald was a pilot with Southwest Airlines, a career he began about six and one-half years before this divorce, earning a gross monthly salary of $6,864.88. Ronald also received additional gross income from the United States Air Force Reserves of $544.48 per month, but he retired from the Reserves about the time of the divorce.
By stipulation, Iris received her doubloon collection, the Honda Accord she had been driving during the marriage, one-half of the notes due on the two second mortgages held jointly by the parties (Iris' half is $150.00 a month), the marital home along with its mortgage payments of $493.00 a month, and a rental home along with its $205.00 monthly mortgage payment and the right to collect the $415.00 monthly rent thereon. In addition, Iris had $400.00 in a checking account, an IRA with an approximate balance of $6,500.00, and approximately $3,500.00 cash, proceeds from a CD she cashed at the time of the parties' separation in order to pay living expenses. Custody of the parties' 19-year-old daughter, Kerry, was also placed primarily in Iris by stipulation.[1]
Ronald received, by stipulation of the parties, a Porsche valued at $6,000.00, a 1977 van, and a Honda CRX; one-half of the notes due on the two second mortgages held by the parties ($150.00 a month); his coin collection; two rental homes along with their monthly mortgage notes of $465.00 and $174.00. Ronald *523 planned to use one of these homes as his residence; the other would provide him with a monthly rental payment of $270.00. Custody of the parties' 15-year-old daughter, Tracey, was placed primarily in Ronald by stipulation.[2] In addition, Ronald had a $5,957.75 Southwest Airlines profit sharing account; savings of $2,668; a $20,000.00 401K plan; a $12,000.00 IRA; and title to $5,756.00, which he said was for the children's college educations.[3]
The parties stipulated that Iris would receive alimony, leaving the amount of the award to the chancellor. By final decree, the chancellor made awards to Iris of $1,750.00 monthly alimony, to increase by $100.00 a month in April 1993, when she would no longer be eligible for dependent coverage on Ronald's medical insurance; $500.00 child support for Kerry, to increase by $400.00 a month should Tracey decide to live with Iris; one-half of Ronald's $20,000.00 401K, which was accumulated during the course of the marriage[4]; one-half of Ronald's $5,957.75 Southwest Airlines profit sharing account, also acquired during the course of the marriage[5]; one-fourth or $3,750.00 of Ronald's IRA, accumulated during the course of the marriage; most of the household furnishings; one-half of All That Jazz; and one-half of any 1990 or 1991 federal or state income tax refund received by Ronald. The parties had stipulated that Iris would receive one-half of Ronald's military retirement pay for the years they lived in community property states and the chancellor was asked to determine the percentage to which Iris was entitled for the remaining years. The chancellor awarded Iris 45% of Ronald's military retirement income for these years.
Ronald was ordered to maintain medical insurance on the children and to maintain Iris as a dependent on his medical insurance for one year. The parties had stipulated that their children would be provided four year college degrees, but asked the chancellor to determine the source of funds for this education. Ronald was ordered to pay for both children's four year college degrees. Ronald was awarded all of his Southwest Airlines Credit Union accounts (approximately $2,200.00); some home furnishings; and one-half of All That Jazz. Ronald was allowed to claim both children as income tax deductions for 1990, 1991, 1992, and 1993. After 1993, Iris could claim Kerry if she is still eligible as a dependent and Tracey could be claimed by whomever has primary custody. Ronald was also ordered to pay Iris' attorney fees and all court costs.

III. THE LAW

A. Alimony
This Court has recently provided guidance to this state's chancellors, regarding division of marital assets and collateral awards of alimony, with the cases of Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994), Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994), and Johnson v. Johnson, 650 So.2d 1281 (Miss. 1994). The combined net effect of these cases is that the chancellor must equitably divide marital assets in light of each party's nonmarital property. If this division will, in combination with each party's nonmarital assets, adequately provide for both parties, the chancellor's task is complete. If, however, this equitable division leaves one party with a deficit, alimony should be considered. Johnson, 650 So.2d at 1287.
In the instant case, the parties apparently owned no nonmarital property, as everything at issue was acquired during the course of the marriage. The parties effected a division of much of their marital property by stipulation. Upon the chancellor's completion of this division, Iris had a $400.00 checking account, a $6,500.00 IRA, approximately $3,500.00 cash, $3,750.00 from Ronald's IRA, *524 a Honda, $150.00 monthly income from a mortgage note, $210.00 net monthly income from a rental house, a home to live in and its $493.00 monthly mortgage payment, and rights to one-half ($2,978.87) of Ronald's profit sharing plan, one-half ($10,000.00) of Ronald's 401K plan, and 45% of Ronald's military retirement for the years the couple had resided in non-community property states.
The completed property division provided Ronald with savings of $2,200.00, an $8,250.00 IRA, a $6,000.00 Porsche, a van, and a Honda CRX; $150.00 monthly income from a mortgage note, $94.00 net monthly income from a rental house, a home to live in and its $465.00 monthly mortgage payment, one-half ($2,978.87) of his profit sharing plan and any increases to the plan, one-half ($10,000.00) of his 401K plan along with any increases, and 55% of his military retirement accrued in non-community property states.
This division, while equitable, leaves Iris with a deficit when viewed in light of the parties' lack of nonmarital property. If the IRAs are considered liquid assets, Iris has $14,150.00 liquid assets, $360.00 monthly income, an automobile, a home and responsibility for its mortgage payment. She will not receive benefits from Ronald's profit sharing plan, 401K plan, or military retirement until Ronald is eligible to receive these benefits. Ronald has $10,450.00 liquid assets, $244.00 monthly income, three automobiles, a home and responsibility for its mortgage payment, plus his monthly salary of $6,864.00. Ronald also retains rights to one-half of his profit sharing plan and one half of his 401K plan, along with any increases to these funds, 55% of his military retirement accrued in non-community property states, and 50% of his military retirement accrued in community property states. Even had the parties not so stipulated, an award of alimony to Iris is in order.
The amount of an award of alimony is within the chancellor's discretion. Brennan v. Brennan, 638 So.2d 1320, 1324 (Miss. 1994). The chancellor should consider the lifestyle to which the wife has become accustomed, the value of her assets and income, and the husband's ability to pay. Id, at 1324. Only where the chancellor manifestly erred or abused his discretion will this Court interfere with an award of alimony. Box v. Box, 622 So.2d 284, 287 (Miss. 1993). This Court considers the nine Brabham[6] factors in its review of an award of alimony. Box, 622 So.2d at 287.
(1) Ronald is in good health and has an excellent earning capacity. In fact, his earning capacity is likely to increase as he gains seniority with the airline and moves up in position and rank. (2) Iris is in only fair health. She has been treated by a psychologist, has recently suffered Pitharea Rosea, a rash caused by nerves, and receives hormone therapy in an attempt to avoid a recommended hysterectomy. Iris' present earning capacity is low, but with the completion of her Masters degree she can earn a respectable teacher's salary.
(3) Sources of income for Ronald, in addition to his employment income, are basically the same as for Iris: one-half of two second mortgages and rents from their respective rental properties. (4) and (5) Iris' and Kerry's reasonable monthly expenses, as found by the chancellor, are approximately $2,500.00, $500.00 of which is directly attributable to Kerry's support.[7] (6) Ronald's and Tracey's reasonable monthly expenses, as found by the chancellor, are about $2,500.00.
(7) Clearly Ronald's tax burden will be greater than Iris', as Iris has no employment income, although Ronald is allowed to claim both daughters for 1990, 1991, 1992, and 1993. (8) Iris has free use of most of the home furnishings and of an automobile, but is responsible for the mortgage on the marital home.
(9) There are no other facts and circumstances in the record which should be considered. Although Ronald claims the chancellor *525 failed to consider Iris' wrongful conduct (allegedly cutting wires on his van; selling some of Ronald's stock, the proceeds from which she returned to Ronald), the allegations were prominently before the chancellor, as were allegations that Ronald had tampered with Iris' car, rendering it inoperable, and that he had secreted away money in Texas.
Starting with Ronald's gross pay, $6,864.00, deductions for federal and state taxes[8] and FICA would total approximately $2,133.04, leaving Ronald with $4,730.96. From this figure, further deductions for Union dues and health, life, and disability insurance totalling $101.06[9] must be subtracted, leaving Ronald with $4,629.90 net pay. When Ronald's income from his half of the mortgage note ($150.00) and his net income from his rental house ($94.00) are added, Ronald has a monthly net income of $4,873.90. Subtracting the amount of alimony, after the $100.00 increase, and child support for Kerry leaves Ronald with $2,523.90. Ronald submitted his living expenses as $2,414.31 and testified that these expenses would increase by $700.00 with Tracey in his care. However, the chancellor found, correctly in my view, that reasonable living expenses for Ronald and Tracey are about $2,500.00. Even after subtracting the amounts awarded for alimony and Kerry's child support, Ronald can afford his reasonable living expenses. Should Tracey decide to reside with Iris[10], Ronald's expenses should decrease, but he will be required to pay an additional $400.00 in child support. Moreover, when he files his income tax returns, Ronald can take advantage of an additional deduction for the alimony paid to Iris.
Given the parties' respective situations, the chancellor did not err in the amount of alimony awarded.[11] The amount awarded is reasonable in view of Iris' needs and Ronald's ability to pay and still maintain a decent standard of living. Brennan, at 1324.
Certainly the award of alimony must be reviewed in conjunction with any award of child support, including the order that Ronald pay college expenses. However, due to Ronald's greater earning capacity and the fact that Ronald stated he would be willing to pay for both children's four year college degrees if Iris is unable to contribute, no error is reflected in the amount of alimony awarded. When Iris has completed her degree and is back in the work force, Ronald may certainly request a modification.

B. Child Support
Although, as the chancellor noted in the instant case, a trial court lacks authority to order child support post-majority, where parties contract to pay post-emancipation expenses for their children, such as college expenses, the contract is binding. Crow v. Crow, 622 So.2d 1226, 1230 (Miss. 1993). In Crow, the parties had entered into a "Stipulation and Agreement" which specifically covered college expenses. This "contract" was incorporated into the divorce decree. The Gambrells stipulated that their children would be provided with four year college degrees, but left the source of funds to be determined by the chancellor. Ronald later testified that if Iris was unable to contribute toward the college expenses of their children that he would certainly pay such expenses.
The chancellor ordered Ronald to pay the college expenses for the parties' children from the children's college funds titled in Ronald's name and, upon depletion of those funds, Ronald is responsible for such expenses. It seems that the chancellor did not *526 err in incorporating the parties' stipulation into the divorce decree. Given the parties' respective financial situations, as previously discussed, the chancellor did not err in ordering Ronald to provide college expenses for the parties' children. Although this may require support post-majority, the parties did stipulate that such expenses would be provided.
Regarding transportation for Kerry, which the chancellor also ordered Ronald to provide from the children's college funds held in Ronald's name, the child had not reached majority age at the time of the divorce decree. Kerry, the parties' 19-year-old daughter, needed reliable transportation to get to and from her job and college. This is also a reasonable award of child support, particularly since the parties' division of marital property by stipulation left Ronald with three vehicles.
The final decree orders Ronald to maintain his daughters as beneficiaries on his life insurance policy until Tracey, the youngest, reaches 22 years of age. While this would ordinarily fall under the "trial court cannot order post-majority support" umbrella, this was part of the stipulation entered into by the parties. See Crow, 622 So.2d at 1230.
There is no evidence that the chancellor failed to consider Iris' resources in ordering Ronald to pay child support. The chancellor had evidence of both parties' finances, incomes, and expenses before him. It seems clear that he fully considered Iris' lack of income and Ronald's comfortable income in making the award of child support. Ronald's income is sufficient to provide for Tracey's support in addition to paying alimony to Iris and child support for Kerry. Iris's expenses and "income," however, clearly show that she can not be required to contribute to Tracey's expenses by paying child support to Ronald. Iris would, however, need additional funds with which to support Tracey should the child decide to reside with Iris. The chancellor did not err in failing to award child support to Ronald while awarding such support to Iris in the event Tracey changes residences. Again, Ronald may seek a modification of this decree when circumstances change sufficiently that Iris can contribute to the children's living expenses and/or college expenses.

C. Attorney Fees
The test for whether attorney fees should be awarded in divorce cases has evolved to the following familiar standards. Attorney fees are not generally awarded unless the party requesting such fees has established the inability to pay. Dunn v. Dunn, 609 So.2d 1277, 1287 (Miss. 1992); Jones v. Starr, 586 So.2d 788, 792 (Miss. 1991). An award of attorney fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards. Adams v. Adams, 591 So.2d 431, 435 (Miss. 1991) (citing Cheatham v. Cheatham, 537 So.2d 435, 440 (Miss. 1988)). See also Armstrong v. Armstrong, 618 So.2d 1278, 1282 (Miss. 1993).
Ronald does not complain that Iris' attorney fee is unreasonable, only that Iris is financially able to pay. After becoming thoroughly versed in both parties' finances, and after determining how various financial accounts should be divided between the parties, the chancellor ordered that Ronald pay Iris' attorney fees of $7,431.24. The majority claims this was error because the chancellor did not make a finding of fact regarding Iris' inability to pay.
Contrary to the facts in Johnson, Iris does not have a "considerable nonmarital estate." Johnson, 650 So.2d at 1288. Consequently, there is nothing in the record of the instant case to prevent this Court from following the general rule that where the chancellor fails to make specific findings of fact, this Court will assume he found in favor of the Appellee  Iris. Given that Iris twice testified she was unable to pay her attorney fee, the chancellor did not abuse his discretion in making this award.

IV. CONCLUSION
The majority states "the chancellor's order fails to take into consideration the parties' stipulated division of assets, placing a disproportionate burden of financial responsibilities on Ronald without regard for Iris' potential for self-sufficiency." In my view, the chancellor's order clearly reflects his consideration *527 of the parties' stipulated division of assets. While the majority of financial responsibilities is placed on Ronald, this apportionment is equitable because Ronald currently stands in a markedly superior financial position as compared to Iris. "Iris' potential for self-sufficiency" has not been overlooked. The chancellor's awards will allow Iris to achieve this status; once she has done so, Ronald may request appropriate modifications. When considered together, the division of marital assets, alimony, and child support are equitable and afford the same relief that would result on remand after application of Hemsley, Ferguson, and Johnson. I would, therefore, affirm the chancellor.
PITTMAN and SMITH, JJ., join this opinion.
NOTES
[1] During the course of these proceedings, Ronald received a 3% pay raise, increasing his gross monthly income to $6,864.88.
[2] Iris claimed these funds were not specifically intended for college expenses but for whatever the girls wanted.
[3] The chancellor entered a Qualified Domestic Relations Order (QDRO) for both the 401K plan and the profit sharing plan.
[1] Kerry chose to stay with her mother.
[2] Tracey chose to live with her father. The chancellor made the custody of Tracey a flexible arrangement to allow a change in her custody as she desired without coming back into court.
[3] Iris claimed these funds were not specifically intended for college expenses but for any of the girls' expenses.
[4] A QDRO was subsequently entered.
[5] Again, the chancellor entered a QDRO.
[6] Brabham v. Brabham, 226 Miss. 165, 176, 84 So.2d 147, 152 (1955).
[7] This figure includes not only the housenote and utilities, car and medical insurance, food, automobile maintenance, entertainment, grooming and clothing, uninsured medicals, etc., but also the cost of Iris' tuition and books.
[8] Figured at the 1995 tax rate with Ronald claiming the deductions available for himself as a single person with two dependent children. This tax rate is, of course, higher than that in effect at the time of this divorce.
[9] The amounts submitted by Ronald.
[10] Though Iris alleges that Tracey indeed now resides with her, there is nothing in the record to prove this allegation. Nonetheless, by virtue of the chancellor's finding of Ronald's and Tracey's reasonable expenses, and by the provision of additional child support if Tracey chose to reside with her mother, the chancellor apparently considered Ronald's ability to provide support for this child in either household.
[11] The provision ordering that alimony be increased by $100.00 a month when Ronald can no longer carry Iris as a dependent on his medical insurance seems clearly intended to allow Iris to obtain her own medical insurance.