736 So.2d 409 (1999)
Betty J. PRESCOTT, Appellant,
v.
Fredric L. PRESCOTT, Sr., Appellee.
No. 97-CA-00519-COA.
Court of Appeals of Mississippi.
March 23, 1999.
*411 William Boerner, Brookhaven, Attorney for Appellant.
Wayne Smith, Attorney for Appellee.
BEFORE BRIDGES, P.J., DIAZ, AND SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. Betty J. Prescott and Frederic L. Prescott, Sr., were granted a divorce based upon irreconcilable differences. Mrs. Prescott was awarded a portion of certain employment benefits that Mr. Prescott had earned. Attorneys' fees were awarded to Mrs. Prescott. Both parties appeal, each arguing that the property division was inequitable. Mr. Prescott also challenges the attorneys' fees. We affirm in part, but reverse for further consideration of the retirement annuity, the automobiles, and the attorneys' fees. Those portions of the decree are remanded for further proceedings.

FACTS
¶ 2. Betty J. Prescott and Frederic L. Prescott were married on October 29, 1988. At the time of their marriage, Mr. Prescott had been employed by the Plantation Pipeline Company, located in Baton Rouge, Louisiana, for thirty-one years. Mrs. Prescott served as the office manager of Tree Mart, Inc., a logging equipment and service business near McComb, Mississippi. The couple resided in Franklin County, Mississippi, in a home owned by Mrs. Prescott's disabled daughter.
¶ 3. The Prescotts separated on September 24, 1995. Two days later, Mrs. Prescott filed for divorce. Ultimately the parties agreed to a divorce based on irreconcilable differences. At the time of the separation, Mr. Prescott had a retirement account valued at $268,435 and a thrift plan worth $315,000 which had been rolled into an A.G. Edwards account. We will refer to the account in the same manner as did the chancellor, "the thrift account." Plantation offered Mr. Prescott early retirement and a severance pay package worth $67,500. The offer was accepted in October 1995. He retired with 38 years and 8 months of service but continues to perform occasional contract work for his old employer. He also receives $2,400 per month from his thrift account.
¶ 4. In the November 3, 1995 order, Mr. Prescott was ordered to pay temporary support in the amount of $534 per month, which included $150 in alimony and the $384 mortgage payment on the home. At the trial held on three days spread from September to November 1996, much of the focus was on the allocation to the marriage of the benefits that Mr. Prescott had earned at Plantation. As will be detailed below, a senior benefits analyst for Plantation, Mary Guerin, provided calculations. Using these figures, the chancellor determined that the marital estate consisted of $68,000 from Mr. Prescott's thrift account, $47,330 from his retirement account, and a share of his severance package valued at $14,530. A Tree Mart profit sharing plan *412 worth $7,000 and 1.28 acres of land in Amite County valued at $600 were also included. Mrs. Prescott was awarded 55% of the marital estate, while Mr. Prescott received 45%.
¶ 5. The chancellor ordered Mr. Prescott to pay Mrs. Prescott's credit card debt, which totaled $14,848.91, and further awarded her the 1989 Honda Accord and the 1992 Ford truck. Mrs. Prescott was held to be solely responsible for the loan taken out for improvements on the home owned by Mrs. Prescott's daughter where the couple resided. The chancellor denied Mrs. Prescott's request for alimony. Mrs. Prescott filed a post-judgment motion to amend, and sought attorneys' fees and temporary alimony for January, 1997. The chancellor amended the judgment, awarded Mrs. Prescott $7,500 in attorneys' fees but denied the month of temporary alimony.
¶ 6. Mrs. Prescott appeals, seeking a larger portion of Mr. Prescott's retirement account and severance package, full payment of her attorneys' fees, and lump sum alimony. Mr. Prescott cross-appeals, arguing that Mrs. Prescott is not entitled to any percentage of his thrift account, retirement account, or severance package. Among other claims, he alleges that he should be awarded the 1989 Honda Accord, that Mrs. Prescott should be responsible for her own credit card debt and for paying one-half of the $12,000 loan that he obtained in order to pay her debts.

DISCUSSION

I. The marital estate
¶ 7. The chancellor valued the marital estate at $137,500 as follows:

Thrift Plan (A.G.Edwards) $68,000
Retirement Account $47,330
Severance Pay $14,530
Tree Mart Profit Sharing $ 7,000
1.28 acres located in Amite County $ 600

Many of these amounts were allocations to the period of the marriage of benefits that were earned at Plantation. Mrs. Prescott was awarded 55% of the marital estate, or $75,625. Mrs. Prescott argues that she is entitled to the entirety of Mr. Prescott's severance package and a greater share of his retirement account. On appeal there is no argument presented as to the thrift plan.

A. The severance package
¶ 8. The deposition of Mary Guerin, senior benefits analyst for Plantation, was introduced at trial. She explained that in calculating a severance benefit, employees were given two weeks credit for each year of service up to a maximum credit of 65 weeks. Because Mr. Prescott had been employed for 38 years, he received the 65 weeks credit. His applicable weekly wage was calculated to be $1,038.40. Multiplying that figure by 65 gives the value of the severance package, $67,496.
¶ 9. When asked to calculate the value of the package for a seven year period, which was the length of the marriage, the formula remained the same. The weekly wage was multiplied by 14 rather than 65, with the result being $14,537.60. The chancellor determined that this amount was to be included in the marital estate, of which Mrs. Prescott received 55%.
¶ 10. On appeal, Mrs. Prescott argues that the entire severance package should be considered part of the marital estate since it did not come into existence until 1995. The date of the creation of the entitlement is not disputed, but the severance package itself is based on an employee's total years of service with the company. The package is proportional, as the longer an employee's time with the company, the greater the value of severance. Mr. Prescott had been employed by the company for nearly 32 years when the parties married. Therefore, the vast majority of the benefits arising under the severance package are allocable to the period before the marriage. We hold that the chancellor correctly determined that Mrs. Prescott was only entitled to the amount earned for the seven years of the marriage.
*413 ¶ 11. Mrs. Prescott's argument would logically be the same if the marriage were only for one week, provided the week was the one in which the severance benefit was created. The chancellor determined that what controlled was the period of employment that earned the benefit, not the date on which the benefit was created. Moreover, because there was a maximum credit that Mr. Prescott exceeded, he was not given credit for over five years of service outside the marriage. Mrs. Prescott, on the other hand, received the full benefit of the seven years of the marriage.

B. The retirement annuity
¶ 12. To the extent that retirement funds have accumulated during the marriage, those funds are marital property which should be considered by the chancellor for purposes of an equitable distribution. Selman v. Selman, 722 So.2d 547, 553 (Miss.1998).
¶ 13. The company's analyst, Mary Guerin, testified that the total lump sum annuity to which Mr. Prescott is entitled is $268,435.77. The annuity formula is this: 1.6 × (the number of years of employment) × (the highest average salary for three years within the last ten). In order to determine what amount accumulated during the marriage, Ms. Guerin simply substituted 7 years in place of 38 years and determined that $47,330 was attributable to the marriage.
¶ 14. Mrs. Prescott disputes this figure. Rather than considering each year equal, Mrs. Prescott argues that the value of the annuity had Mr. Prescott retired on the day of the parties' marriage in 1988 should be compared to the value on the date of the separation in 1995. Mr. Prescott's salary was increasing throughout his employment, and most relevantly it increased substantially during the marriage. Therefore, the highest average salary during any three year period for the 10 years immediately preceding the separation was much higher than for the 10 years immediately preceding the marriage. Without reducing by the penalty that Mr. Prescott would have suffered for retiring as early as in 1988, the value of the annuity when the parties married would have been $116,435.77, while the value at the time of separation was $268,435.77. The difference between those two amounts is $152,220.50. That is the amount that Mrs. Prescott says is the portion of the marital estate, not the figure based on a straight-line ratio of the years of marriage compared to the years of employment.
¶ 15. We find no particular basis to choose one calculation over the other. Should the marital estate be allocated 7/38 of the total benefit, which is the fraction based on the years of marriage compared to the years of employment? Or should the marital estate be assigned a little over $152,000, which reflects the growth in the value of the benefit during the marriage?
¶ 16. We first note that what Mrs. Prescott seeks is logically based on the assumption that had Mr. Prescott's first day of work at the company been the day of the parties' marriage, he would have earned a benefit of about $152,000 by the time of the divorce. In other words, the preceding years can be ignored in determining the marital estate. However, as of the date of the marriage Mr. Prescott had been with the company for 31 years. His value to the company, and therefore his salary and its future growth, were significantly benefitted by the years that he had already spent there. Those previous 31 years simply cannot be ignored in determining the retirement annuity that he earned. In other words, the chancellor did not err in refusing to consider the dollar increase in Mr. Prescott's retirement after 1988 to be solely the result of those years of marriage.
¶ 17. On the other hand, Mr. Prescott arguably was at his maximum value to the company during the years of this marriage. The spouse of a high-ranking employee receives at divorce some consideration for her contribution to making that valuable work possible. The spouse of *414 such an employee receives more at divorce than would the spouse of an employee whose marriage coincided with the first 7 years instead of the last 7 of a 38-year career.
¶ 18. Though we find no definite allocation that had to be made, it is evident that the chancellor chose one extreme. He allocated strictly on the basis of the number of years of marriage compared to years of employment. That gives no consideration to the fact that Mrs. Prescott was the spouse of an employee who was at the top of the employment ladder. On the other hand, to allocate as Mrs. Prescott requests which is strictly on the basis of the dollar increase in the value of the annuity during the marriage, would give no consideration to the fact that Mr. Prescott was such a highly-paid, valuable employee precisely because he had spent all those pre-marriage years with the company.
¶ 19. We are reversing for other reasons and we do not order the chancellor to "split the difference" or to make any other specific allocation of this retirement annuity. We do hold that on remand the chancellor should again address the retirement annuity and take into consideration the twin concerns that we have outlined above. He should again enter an order allocating a portion of the annuity to the marital estate that in his discretion represents the considerations that we have identified.

II. Lump sum alimony
¶ 20. Mrs. Prescott argues that she is entitled to lump sum alimony, citing the great disparity between her separate estate, worth $94,325, and Mr. Prescott's separate estate, valued at $562,825.
¶ 21. There are supreme court mandated considerations for the award of lump sum alimony:
1) substantial contributions to the wealth of the household by such acts as quitting a job to become a housewife or direct assistance in the husband's business;
2) the length of the marriage;
3) existence of significant separate income by the alimony recipient; and,
4) financial security in the absence of an award.
Sarver v. Sarver, 687 So.2d 749, 757 (Miss. 1997). The court has said that a disparity in the size of the spouses' estates is the most compelling factor. Id.
¶ 22. Mrs. Prescott contends that she contributed substantially to the accumulation of wealth by Mr. Prescott. On the other hand, she did not quit her job at Tree Mart nor become a housewife. She did not assist in Mr. Prescott's business. Mrs. Prescott's separate estate, including her allocated portion of the marital property, is valued at $94,325. Mr. Prescott's estate is worth $562,825. If the awards of personal property are included, Mrs. Prescott's estate totals $105,649. Of course, we are remanding for an reconsideration of the allocation of the marital estate as a result of the retirement annuity which may increase her estate. However, the great disparity does not automatically entitle Mrs. Prescott to a greater portion of Mr. Prescott's estate.
¶ 23. The focus on the purpose of equitable distribution should not be distorted because of a disparity of estates. The reason the estates are disparate is that equitable distribution, taking into account assets outside of the marriage, properly made them so. The purpose of lump sum alimony is not to eliminate any disparities that arise from the equitable distribution award. "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore where one expands, the other must recede." Gambrell v. Gambrell, 650 So.2d 517, 520 (Miss.1995). The chancellor may divide marital assets and award periodic and/or lump sum alimony as equity demands. Id. The two concepts when joined do not entitle each spouse to insist on an equal division of all property, marital and non-marital. Alimony does not, in other words, *415 require one spouse to be given what was not achieved under equitable distribution.
¶ 24. The chancellor found that Mr. Prescott's non-marital estate was this:

Residence, Baker, LA ($40,000) ½ interest $20,000
50 acres, Louisiana ($43,500) ½ interest $21,750
Non-marital thrift plan accumulation $247,000
Non-marital employment retirement $221,105
Severance pay $52,970
Total $562,825

The majority of Mr. Prescott's estate predates the marriage. Mrs. Prescott's share of the marital property has already been calculated and found to be proper. Regardless of the possible adjustment on remand to the allocation of the retirement annuity, we find no merit to the argument that the fact of disparate estates requires alimony. The different estate amount is explained by the marriage occurring after substantial property had already accumulated.

III. Attorneys' fees
¶ 25. At trial, Mrs. Prescott testified that she was unable to pay her attorneys' fees. In his initial opinion, the chancellor specifically refused to award any attorneys' fees. Mrs. Prescott then filed a motion to alter or amend the judgment. At that time the chancellor awarded her $7,500 in attorneys' fees. On appeal, she asks that she also be awarded the difference between $7,500 and $10,118.30, the total amount of her attorneys' fees.
¶ 26. The determination of attorneys' fees is left to the sound discretion of the chancellor. We are reluctant to disturb a chancellor's discretionary determination whether or not to award attorneys' fees and the amount of the award. The chancellor cannot award fees if the party is financially able to pay those fees. Magee v. Magee, 661 So.2d 1117, 1127 (Miss.1995).
¶ 27. Whether or not the chancellor must make an on the record determination that a party is unable to pay attorneys' fees is a matter of some contention. There is case law to support both positions. The supreme court has affirmed an award of attorneys' fees based simply on the wife's testimony that she was unable to pay her attorney, reasoning that "the chancellor apparently found [this] testimony credible enough to support an award of attorney fees in the amount of $1,000.00." Bland v. Bland, 629 So.2d 582, 588 (Miss.1993). Similarly, the court held that even in the absence of a finding, the chancellor had sufficient evidence in the record to award attorneys' fees when there was evidence of the ex-wife's monthly income and expenses that was sufficient to determine whether she was able to pay her fees or not. Crowe v. Crowe, 641 So.2d 1100, 1105 (Miss.1994).
¶ 28. In some instances, however, testimony or other evidence regarding inability to pay attorneys' fees has been found insufficient to justify such an award where the chancellor fails to make a specific finding on the record. The court held that a chancellor abused his discretion in awarding attorneys' fees where "[a]lthough [the wife] stated that she was unable to pay her attorney fees, the Chancellor made no such finding in his extensive Conclusions of Law and Findings of Fact, determining only that the fees were reasonable in light of the fact `that the litigation has been protracted and difficult.' Thus the chancellor abused his discretion in making the award of attorney fees without a finding that [the wife] was unable to pay." Gambrell v. Gambrell, 650 So.2d 517, 521 (Miss.1995). The court reversed and remanded the award of attorney fees. See also Johnson v. Johnson, 650 So.2d 1281, 1288-89 (Miss. 1994) (reversed due to the absence of finding that the wife was unable to pay her attorneys' fees).
¶ 29. Normally when reviewing a chancellor's decision, the appellate court considers the entire record and accepts all those facts and reasonable inferences therefrom which support the chancellor's findings. Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993). "Where the trial court failed to make any specific findings of fact, this Court will assume that the issue was decided consistent with the judgment *416 and these findings will not be disturbed on appeal unless manifestly wrong or clearly erroneous." Par Industries, Inc. v. Target Container Co., 708 So.2d 44, 46 (Miss.1998). Specifically in domestic proceedings, "when there are no specific findings of fact, this Court often resolved fact issues in favor of the appellee." Sarver, 687 So.2d at 757. Findings, made or inferred, will not be reversed where they are supported by substantial credible evidence in the record. Anderson v. Anderson, 692 So.2d 65, 72 (Miss.1997).
¶ 30. On those occasions when the requirement of findings for attorneys' fees is treated differently, it may be because awarding a party its attorneys' fees is foreign to American legal practice. Something specific on the record may at times be considered necessary before this exception to the general rule will be permitted.
¶ 31. Regardless of possible explanations, we are faced with a not altogether clear rule. There are definitely precedents in which attorneys' fee awards have been upheld even without a specific finding by the chancellor that the party receiving them was unable to pay. We adopt that approach as it is consistent with normal review of chancellor's rulings. When there is substantial evidence in the record to support such an award, we will infer that the chancellor determined that the recipient was unable to pay the fees.
¶ 32. In the present case, the chancellor made no finding that Mrs. Prescott was unable to pay her attorneys' fees. There actually is substantial evidence in the record that she does have the ability to pay those fees, particularly since her financial status post-equitable distribution may be considered. Hankins v. Hankins, 729 So.2d 1283 (¶ 13) (Miss.1999). Because the chancellor's award is inconsistent with the evidence in the record, but since we also do not have the benefit of his findings, we reverse and remand for further consideration of this issue.

IV. Temporary support
¶ 33. Beginning in November 1995, over a year before the divorce, an order was entered requiring that Mr. Prescott pay Mrs. Prescott $150 per month in temporary support and the $384 mortgage on the marital home each month until further notice. The chancellor's letter opinion granting the divorce and establishing the various distributions and entitlements was issued December 20, 1996. The final judgment was not entered until February 4, 1997.
¶ 34. Mrs. Prescott claims that she is entitled to $534 in temporary support for the month of January, 1997, i.e., for the month after the letter had been issued but before the judgment was entered. Mr. Prescott argues that any delay in entry of the final judgment was Mrs. Prescott's own fault. The chancellor instructed Mrs. Prescott's attorney to prepare the judgment but a draft was not received by Mr. Prescott's attorney until January 16, 1997. Because several items were not included in the draft, entry of the judgment was delayed until February 4, 1997.
¶ 35. The December 20 letter would not necessarily end Mr. Prescott's obligations. Until Mrs. Prescott had received what was to substitute for the temporary support to which she was entitled, we would not infer that the chancellor meant for the temporary support to end. There is no evidence that she received anything in January under the chancellor's December letter decision that would substitute for the temporary support that is at issue. The supreme court has held that entry of a final decree of divorce does not relieve the obligor from paying an arrearage of temporary alimony which accrued before the entry of that final decree. Lewis v. Lewis, 586 So.2d 740, 741 (Miss.1991). However, that did not involve the narrow question of whether the announcement of a decision might end the temporary support, or was the decree itself necessary?
¶ 36. The chancellor by post-judgment motion was requested to award the January 1997 temporary support payment, but *417 he refused to do so. Since temporary support was to continue until further order, and the chancellor declined to interpret his December 20, 1996 letter opinion as continuing the temporary support, we find that to be within his discretion. Certainly by the time the matter was raised, which was after the February 4, 1997 final decree, there were other sums that Mrs. Prescott had been awarded.

CROSS-APPEAL

I. The A.G. Edwards thrift account
¶ 37. Mrs. Prescott on direct appeal does not challenge the percentage of the A.G. Edwards thrift account that the chancellor awarded her.
¶ 38. Mr. Prescott on cross-appeal alleges Mrs. Prescott should not have received a portion of any of his funds, including the retirement account, the severance package, and the thrift account. We have already discussed the division of the retirement account and the severance package, and found some division to be necessary. Mr. Prescott makes no argument in support of his contention regarding the thrift plan. To the extent that Mr. Prescott is arguing that no portion of any of these benefits could be allocated to the marriage, we disagree for the reasons already stated.

II. The vehicles
¶ 39. Mr. Prescott challenges the chancellor's award of the 1989 Honda Accord to Mrs. Prescott. He argues that he purchased it by trading in a vehicle which he owned prior to the marriage, that it was titled in his name, and that he alone made the payments. By awarding the vehicle to Mrs. Prescott, along with the 1992 Ford truck, the chancellor left him without any vehicle.
¶ 40. The Ford truck was acquired in 1992 and title placed in Mrs. Prescott's name. She stated that she made the monthly payments on the truck but admitted that money contributed by Mr. Prescott went at least in part toward the payment. The loan balance on the truck at the time of trial was $1824.90, an amount which the chancellor ordered Mr. Prescott to pay. The result was that Mrs. Prescott was awarded both vehicles and Mr. Prescott was ordered to pay off the remaining balance on one of them.
¶ 41. Testimony at trial revealed that Mrs. Prescott drove the Honda during the week while Mr. Prescott had the benefit of a company truck. On weekends, Mrs. Prescott testified that Mr. Prescott ordinarily drove the truck. In her opinion, he drove the Honda ten percent of the time.
¶ 42. The supreme court has stated that there is no automatic right to an equal division of jointly accumulated property. It is left to the discretion of the court in light of all the factual circumstances on the method of division. Collins v. Collins, 722 So.2d 596, 599 (Miss.1998). However, when the only vehicles were acquired during the marriage, it may be an abuse of discretion to award them to one party while depriving the other of any means of transportation. Selman v. Selman, 722 So.2d 547, 553 (Miss.1998). The court held that "[w]hile both of these cars are titled in [the husband's] name, they were acquired during the marriage and are thus subject to equitable distribution unless [he] can show they are separate property." Id.
¶ 43. Both the Honda and the Ford were acquired during the marriage. The chancellor offered no explanation for awarding both to Mrs. Prescott. Consequently, we reverse and remand for further findings. Though neither may have a particularly high value, a vehicle is of sufficient necessity to parties that to award the only two vehicles to one spouse initially appears an error.

III. The $12,000 loan
¶ 44. Mr. Prescott contends that in 1994, he borrowed $16,000 against his thrift account and gave Mrs. Prescott $6,000 to pay her credit card bills. After the parties separated, Mr. Prescott wished to withdraw money from the thrift account. *418 In order to do this, he claims that he had to repay the $12,000 loan balance. He was forced to obtain a personal loan against his real property to make the payment. According to Mr. Prescott, this constitutes a marital debt, one-half of which should be paid by Mrs. Prescott.
¶ 45. Mrs. Prescott testified that the $6,000 was given to her with no expectation that it be repaid. Mr. Prescott himself indicated that he did not instruct Mrs. Prescott to reimburse him. We find such testimony supports the determination that the funds were a gift. The supreme court has held that where the proof at trial indicates that property was voluntarily given with the intent that it be a gift, the property becomes that of the recipient. Holleman v. Holleman, 527 So.2d 90, 94 (Miss.1988).

IV. Credit card payments
¶ 46. The chancellor ordered Mr. Prescott to pay Mrs. Prescott's outstanding credit card debt, which totaled $14,848.91. These expenses were broken down as follows:

Ford Motor Credit $1,824.90
Nations Bank $5,391.58
Providian Bank Corp. $4,366.87
Fleet Bank $3,265.56

Mr. Prescott argues that he is not responsible for these debts, as Mrs. Prescott incurred these expenses on her own. Additionally, by failing to pay the bills during the separation period, Mrs. Prescott allowed the amount due to increase substantially.
¶ 47. All of the credit cards, with the exception of the Nations Bank account, were in Mrs. Prescott's name alone. Both parties testified that on the day Mr. Prescott left the marital home, he signed the application for the Nations Bank credit card. Mrs. Prescott informed him that she would pay off two other credit cards using the Nations Bank card and take advantage of the low introductory rate.
¶ 48. Only Mr. Prescott testified as to the sorts of purchases that Mrs. Prescott made using the credit cards. He stated that she purchased items for the home but then informed him that the items belonged to her daughter. Where there is testimony that the debt incurred was used to make purchases for the marital dwelling, a chancellor's decision ordering the husband to pay the credit card expenses has been upheld. Bullock v. Bullock, 699 So.2d 1205, 1212 (Miss.1997).
¶ 49. Mr. Prescott argues that the balance of each credit card increased over $1,000 due to Mrs. Prescott's failure to make any payments. Although wasteful spending or negligence in financial affairs are factors that the chancellor may consider in dividing the property, they are not controlling.

V. Equitable adjustment
¶ 50. Finally, Mr. Prescott seeks a reduction in Mrs. Prescott's equitable distribution for the value of the 1992 Ford truck, the 1989 Honda Accord, the $6,000 which he gave Mrs. Prescott in 1994 so that she could pay her credit card bills in full, the $14,848.91 payment to satisfy Mrs. Prescott's current credit card debt, and the $2,000 which he gave her so that she could purchase a mobile home.
¶ 51. We have reversed for a determination regarding whether Mr. Prescott is entitled to the Honda. The $6,000 was a gift for which no equitable adjustment is appropriate. The $2,000 which Mr. Prescott gave his former wife to enable her to purchase a mobile home is simply another asset that the chancellor had broad discretion to award to Mrs. Prescott. Various items are purchased throughout a marriage for the benefit of either or both spouses. The chancellor is not required to trace the funds behind each item and place the parties back to where they would have been had they not been married. The chancellor did not err in failing to award Mr. Prescott an equitable adjustment for the $2,000. Finally, the $14,848.91 was to satisfy credit card payments which arose, at least in part, through the purchase of items for the marital home. Mr. Prescott is not entitled to an equitable adjustment.
*419 ¶ 52. We note the difficulty of this case factually and legally. It is no small task to unravel and allocate the accumulated assets of a marriage, especially when they are intertwined with employment benefits of considerable complexity. We have questioned some specific allocations but commend the chancellor for having charted the course that we too follow.
¶ 53. THE JUDGMENT OF THE FRANKLIN COUNTY CHANCERY COURT IS AFFIRMED IN PART, REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED EQUALLY AGAINST THE PARTIES.
McMILLIN, C.J., KING, P.J., BRIDGES, COLEMAN, DIAZ, LEE, AND THOMAS, JJ., CONCUR.
IRVING, J., CONCURS IN RESULT ONLY.
PAYNE, J., NOT PARTICIPATING.