**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2008-CA-00476-SCT**

*JUDITH R. WHEAT*

*v.*

*JAMES M. WHEAT*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/19/2008 |
| TRIAL JUDGE: | HON. JAYE A. BRADLEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DEAN HOLLEMAN |
| ATTORNEY FOR APPELLEE: | GARY L. ROBERTS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 06/24/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Judith R. Wheat and James M. Wheat were divorced on October 10, 2007, on the ground of uncondoned adultery, in the Chancery Court of Jackson County.  Also at issue in these divorce proceedings was the distribution of assets to the parties.   Chancellor Jaye A. Bradley entered the Final Judgment of Divorce; the October 2, 2007, Findings of Fact and Conclusions of Law; and the February 14, 2008, Supplemental Findings of Fact and Conclusions of Law, and Judith R. Wheat appeals.  For the reasons stated, the Jackson County Chancery Court's final judgment is affirmed in part; reversed in part; and remanded for further proceedings consistent with this opinion.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶2. Judith R. Wheat (Judy) and James M. Wheat (James) were married on January 9, 1988. One son, James G. Wheat (Jamie), was born to the couple on October 12, 1989. During the marriage, Judy was employed by Northrop Grumman in Pascagoula. She worked there for more than thirty years. She was promoted throughout her tenure with the company and eventually served as a program manager. Around September 2004, Judy began an adulterous relationship with one of her superiors at Northrop Grumman. This led to her decision to resign from her position to prevent any adverse effect on her paramour's employment at Northrop Grumman. As a result, Judy's employer offered her a severance package that included a $395,000 gross, lump-sum payment with a net amount of $267,707.50. On her financial declaration, Judy's adjusted gross monthly income from the severance was reported as $6,087.63 in 2005, and $6,549 in 2006, and was set to end in May 2007. After she left Northrop Grumman, Judy started a venture called Updates, LLC. The purpose of this limited-liability company was to buy and resell real property, as well as resell special-order furniture. At the time of trial, Judy testified that this venture had produced no income for her.

¶3. As a result of Judy's adulterous affair, relations between the couple became acrimonious. Judy and James separated on or about March 1, 2005. Judy filed a Complaint for Divorce in the Chancery Court of Jackson County on April 6, 2005. She sought a divorce from James based on irreconcilable differences. The parties failed to reach an agreement.

2

¶4.     On May 27, 2005, James filed his Answer and Counterclaim in which he sought a divorce on the ground of uncondoned adultery.  Additionally, James sought custody of the minor child, child support, health insurance, use and benefit of the marital home, equitable division of marital assets and liabilities, alimony, and attorney's fees.  Judy did not file an answer to the counterclaim.

¶5.     On November 15 and 16, 2006, a trial was held, with both parties presenting evidence and being represented by counsel. On the first day of trial, Judy's complaint for divorce was dismissed due to lack of consent from James pursuant to Mississippi Code Section 93-5-2 (Rev. 2004).  The trial was continued until January 5, 2007, when the parties completed their presentation of evidence.  Judy admitted to uncondoned adultery, and the trial court subsequently granted the divorce on that ground pursuant to Mississippi Code Section 93-5-1 (Rev. 2004).  The trial court issued its Findings of Fact and Conclusions of Law on October 2, 2007.  The Final Judgment of Divorce was entered October 10, 2007.

¶6.     Following the trial, there was a question concerning the value of James's Merchants & Marine Bank pension plan.  The court subsequently ordered an expert to determine the value of the pension.  The expert showed the value of James's pension plan to be $7,298.25 at the time of marriage.  As of April 1, 2007, the value was $180,484.44.  The trial court, in its Findings of Fact and Conclusions of Law, did not find the pension plan to be separate property, but did find that Judy had relinquished any interest in the pension.  In doing so, the court referenced an exhibit that contained a letter written by Judy's counsel, William E. Tisdale, and addressed to James's counsel, Gary L. Roberts, stating: "I have checked with

3

Mrs. Wheat concerning Mr. Wheat's retirement from M&M Bank. She is agreeable that Mr. Wheat can keep his retirement which is estimated at $180,000.00."

¶7.     James filed a Motion for Reconsideration, New Trial, Alteration or Amendment of Judgment or Relief from Judgment on the basis that the judgment incorrectly classified James's nonmarital property and failed to divide the marital assets and liabilities equitably. In support of this motion, James presented an affidavit from Royce Cumbest, the President and Chief Executive Officer of Merchants and Marine Bank. Cumbest attested that James's pension plan was effective November 1, 1970, and was funded by the bank in an amount that was determined on an actuarial basis until 1984. Thus, in 1984, the bank had ceased to make any further contributions to the pension plan. Following a hearing on this motion on January 22, 2008, at which both parties presented oral arguments, the chancery court issued its Supplemental Findings of Fact and Conclusions of Law, finding that, during oral arguments, Judy's counsel had conceded that the pension plan was the nonmarital property of James.

¶8.     Additionally, the trial court, in its Supplemental Findings of Fact and Conclusions of Law, found that Judy's Northrop Grumman Financial Security and Savings Plan should be classified as a marital asset subject to equitable distribution. As a result, the court ordered Judy to prepare and execute a qualified domestic-relations order that would award James $91,458 from the Northrop Grumman savings plan.

¶9.     Aggrieved by this judgment, Judy timely appealed.

**DISCUSSION**

¶10.    Judy alleges eight errors on the part of the chancery court and lists them as follows:

4

(1) The [trial] court erred by including as a marital asset Judy's May 2005 severance agreement proceeds which covered what she would have earned between May 2005 and her earliest retirement date of May 2007, a period after the date of separation;

(2) The [trial] court erred by the inclusion as a marital asset of the "bridge" IRA account received by Judy in connection with her severance agreement of May 2007 representing the amount of contribution she would have received had she remained employed from May 2005 [through] May 2007;

(3) The [trial] court erred in the exclusion as a marital asset that portion of James's M&M pension plan which was attributable to the years of service that overlapped the sixteen years of marriage up to the separation of the parties in 2005;

(4) The [trial] court erred in the exclusion as a marital asset James's Merchants & Marine stock which had been commingled and jointly owned by the parties during the marriage;

(5) The [trial] court erred in the exclusion as a marital asset James's Morgan Keegan IRA [as] there was not sufficient evidence beyond a mere demonstration that said asset was accumulated prior to [or] outside the marriage;

(6) The [trial] court erred in finding the first mortgage assumed by James had a balance of $116,658.00 and in ordering Judy to be responsible for the second mortgage/credit line liability of $40,816.00 on the martial home;

(7) The [trial] court erred in ordering Judy to pay [monthly] child support in the amount of $750.00 when said amount was not based upon Judy's actual adjusted gross income, said support exceeded the statutory guidelines and the same was awarded notwithstanding the court's finding of the absence of any extraordinary needs or expenses;

(8) The [trial] court erred in finding Judy's severance package as an asset subject to equitable distribution and also using the monthly withdrawals from said fund as the basis for ordering child support.

¶11. This Court's scope of review in domestic-relations matters is limited by the familiar substantial-evidence/manifest-error rule. *R.K. v. J.K.*, 946 So. 2d 764, 772 (Miss. 2007)

5

(citing *Mizell v. Mizell*, 708 So. 2d 55, 59 (Miss. 1998)). This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. *Id.* Particularly in the areas of divorce and child support, this Court must respect a chancellor's findings of fact which are supported by credible evidence and not manifestly wrong. *Id.* Manifest error is that error which is unmistakable, clear, plain, or indisputable. *Magee v. Magee*, 661 So. 2d 1117, 1122 (Miss. 1995). Questions of law, however, are reviewed under a de novo standard. *Townsend v. Townsend*, 859 So. 2d 370, 372 (Miss. 2003) (citing *Stacy v. Ross*, 798 So. 2d 1275, 1277 (Miss. 2001); *Zeman v. Stanford*, 789 So. 2d 798, 802 (Miss. 2001)).

¶12. For the sake of clarity in today's discussion, the eight issues listed above have been combined and restated.

## I. WHETHER THE CHANCELLOR ERRED IN CLASSIFYING AS MARITAL PROPERTY JUDY'S 2005 EMPLOYMENT SEVERANCE AGREEMENT AND "BRIDGE" IRA ACCOUNT.

¶13. Judy argues that her 2005 Employment Severance Agreement in the amount of $267,707 (after withholding) and her "bridge" IRA account in the amount of $52,448, were erroneously classified as marital property, because those funds were distributed to her after the separation. James argues that the chancellor applied the law correctly, as the assets were distributed prior to the divorce, and no separate-maintenance or temporary-support orders were issued in this case.

¶14. The guidelines that chancellors must employ in equitable distribution are as follows: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the

6

marital assets equitably. *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).  This Court has defined marital property as "any and all property acquired or accumulated during the marriage.  Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994).

¶15.    Generally, for the purposes of classifying marital property, the marriage runs from the date of marriage until the final judgment of divorce.  This Court has carved out an exception, however, where there exists an order for separate maintenance.  *See Godwin v. Godwin*, 758 So. 2d 384 (Miss. 1999).

> Assets acquired after an order for separate maintenance should be considered the separate property of the parties, absent a showing of either (1) contribution to the acquisition of the asset by the other spouse as contemplated in our decisions in *Ferguson v. Ferguson*, 639 So. 2d 921, 928-29 (Miss. 1994), and *Magee v. Magee*, 661 So. 2d 1117, 1123 (Miss. 1995) or, (2) acquisition of the asset through the use of marital property. [footnote omitted.]

*Id.* at 386.  The Court of Appeals has recognized that the entry of a temporary-support order should also serve as a demarcation or end date for the tallying of marital assets. *See Pittman v. Pittman*, 791 So. 2d 857, 864 (Miss. Ct. App. 2001).

¶16.    The second prong of Judy's argument is that her severance and IRA were compensation she would have earned had she remained employed with the shipyard; therefore, they were payment for future earnings and benefit, not consideration for the years of past service that overlapped with the years she was married.  Judy cites *Berry v. Berry*, 898 A.2d 1100, 1105-1106 (Pa. Super. 2006), for the premise that "[t]he majority of states

7

that have considered the issue have concluded that 'the touchstone of the classification is whether the severance pay was intended to compensate the employee for efforts made during the marriage or to replace post-separation earnings.'" She further cites *Prescott v. Prescott*, 736 So. 2d 409 (Miss. Ct. App. 1999), a case in which the Mississippi Court of Appeals considered how to classify a husband's severance pay.

¶17.   In *Prescott*, the wife argued that her husband's entire severance package was marital property, given that the severance was paid out to him during the marriage. *Id*. at 412. The Court of Appeals found that, since Mr. Prescott had been employed with his company for almost thirty-two years before the parties had married, most of the benefits to which Mr. Prescott had been entitled had accrued before the marriage. *Id*. Thus, the court found that the chancellor did not err in allocating to Mrs. Prescott only a portion of the amount of severance that Mr. Prescott had earned during the seven years of marriage. *Id.*

¶18.   Conversely, James points out that in *Prescott*, the Court of Appeals held that a severance package was, in fact, considered to be marital property.  James further cites *Striebeck v. Striebeck*, 5 So. 3d 450 (Miss. Ct. App. 2008), in support of his argument that assets accrued during the marriage are part of the marital estate.  In *Striebeck*, the Court of Appeals considered whether attorney's fees earned by the husband after the parties had separated, but before they had divorced, could be considered marital property. *Id.* at 454. In holding that the attorney's fees were part of the marital estate, the Court of Appeals noted that the record contained no indication of a property division or temporary-support order entered in the case prior to the distribution of the fees to Mr. Striebeck. *Id.*  Moreover, the

8

court found it significant that Mrs. Striebeck had contributed to her husband's law practice. *Id.* Notwithstanding Judy's argument that the severance package and IRA were distributed for the purposes of providing her with future earnings, not for the purpose of compensating her for past service, Judy and James were married when the severance payout began in 2005, and they remained married until October 2007, after the severance pay was exhausted. The record in this case reflects no temporary-support order or order for separate maintenance. Accordingly, we hold that the chancellor did not err in finding that both the severance and the IRA benefits received by Judy could be considered marital property, given that they were distributed to Judy two years before the divorce.

**II.** **WHETHER THE CHANCELLOR ERRED IN THE EXCLUSION AS A MARITAL ASSET THE PORTION OF JAMES'S PENSION PLAN WHICH OVERLAPPED THE SIXTEEN YEARS OF MARRIAGE.**

¶19. Judy contends that a portion of the appreciation in value of James's Merchants and Marines Bank pension plan was a marital asset, because it was a direct result of years of service and employment during the marriage. A valuation expert showed the value of James's pension plan to be $7,298.25 at the time of marriage. As of April 1, 2007, the value was $180,484.44. Thus, Judy asserts that the chancellor erred in finding that the more-than-$170,000 increase was not a marital asset.

¶20. James argues that Judy stipulated by and through counsel and in her own testimony that the pension was separate property to which James was entitled. James further argues that, even without Judy's concession, he was entitled to his pension, and that the chancellor

did not err in ruling that the pension was separate property. James asserts that his fifteen years of service to the bank occurred prior to the marriage and entitled him to the maximum monthly benefit upon his retirement. Moreover, James maintains that neither he nor the bank made any contributions to the pension during the marriage; thus any appreciation in value was a passive appreciation and not due to the efforts of either party. James cites *Carrow v. Carrow*, 642 So. 2d 901, 906-07 (Miss. 1994), in which this Court held that the appreciated value of a husband's car collection was marital property because the renovation and repair work was performed by both spouses; therefore, the efforts of both contributed to the appreciation in value. James also cites *Franks v. Franks*, 759 So. 2d 1164, 1166-68 (Miss. 1999), in which the converse also was true – income produced by a spouse's separate investments remains separate when no active effort by either spouse contributed to its growth or appreciation.

¶21. James's Motion for Reconsideration, New Trial, Alteration or Amendment of Judgment or Relief from Judgment was supported by an affidavit from the President of Merchants & Marine Bank, in which the bank president stated that the bank had stopped funding James's pension plan in 1984, five years prior to the 1989 marriage. Following a hearing on this motion, in which Judy's counsel conceded that the pension plan was James's nonmarital property, the trial court, in its Supplemental Findings of Fact and Conclusions of Law, found that this concession necessitated a reclassification of the asset as James's nonmarital property.

10

¶22. "Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." **Hemsley,** 639 So. 2d at 914. Given that James showed proof that his pension was fully funded prior to the marriage, and given that Judy's counsel, both in a letter to James's counsel and during oral arguments at the hearing, conceded that the pension was nonmarital property, the chancellor did not commit manifest error in reclassifying the pension as James's nonmarital property. Accordingly, this argument is without merit.

    **III.    WHETHER THE CHANCELLOR ERRED IN CLASSIFYING JAMES'S MERCHANTS & MARINE STOCK AS NONMARITAL BECAUSE THE STOCK HAD BEEN COMMINGLED AND JOINTLY OWNED BY THE PARTIES DURING THE MARRIAGE.**

¶23. The chancellor made a finding that the Merchants & Marine stock, valued at $34,720, was acquired prior to the marriage; thus, it was not subject to equitable distribution. Judy asserts that the chancellor erroneously classified the Merchants & Marine stock as a non-marital asset because this classification was based solely on James's testimony that the stock was purchased prior to the marriage. Judy maintains that, because the stock was jointly titled during the marriage, it became commingled; thus, the stock became a marital asset.

¶24. James points to portions of Judy's testimony admitting that James's shares of stock were his separate property. During cross-examination, Judy testified as follows:

> Q.    . . . Jimmy had testified about some things that he considered to be assets of his prior to the marriage. And I just wanted to ask you briefly

11

about some of that. Jimmy did have some Merchants and Marine Bank stock, did he not?

A.    Yes.

Q.    He owned that prior to the time that you all were married?

A.    Yes.

Q.    And then at some point during the marriage, some of those shares of stock he either conveyed to the two of you jointly or put in your name; did he not?

A.    Yes.

Q.    And then whatever those shares of stock were you conveyed those back to him?

A.    Yes.

Q.    You consider those shares of stock whatever they are to be his separate property?

A.    Yes.

Judy never asserted before the court that the Merchants & Marine Bank shares were marital property. It is well-established that "[b]efore an issue may be assigned and argued in this Court, it must first be presented to the trial court." *Wilburn v. Wilburn*, 991 So. 2d 1185, 1191 (Miss. 2008) (citing *In re: Hampton*, 919 So. 2d 949, 957 (Miss. 2006)). Failure to do so "prevents the trial court from having an opportunity to address the alleged error." *Crowe v. Smith*, 603 So. 2d 301, 305 (Miss. 1992) (citing *Cooper v. Lawson*, 264 So. 2d 890, 891 (Miss. 1972)). Accordingly, Judy is procedurally barred from raising this issue.

**IV. WHETHER THE CHANCELLOR ERRED IN THE EXCLUSION AS A MARITAL ASSET OF JAMES'S MORGAN KEEGAN IRA, AS THERE WAS INSUFFICIENT EVIDENCE BEYOND A MERE DEMONSTRATION THAT IT WAS ACCUMULATED PRIOR TO OR OUTSIDE THE MARRIAGE.**

¶25.    Judy argues that James's testimony that the Morgan Keegan Individual Retirement Account had been obtained prior to the marriage, and that no contributions had been made to the IRA during the marriage, was insufficient to establish that the asset was nonmarital property.  Therefore, according to Judy, James had failed to proffer documentation proving the IRA's nonmarital status; as a result, the chancellor erroneously classified the IRA as separate property based on James's "mere demonstration" that the asset was his nonmarital property.

¶26.    Judy is correct in her assertion that the party arguing to classify an asset as nonmarital property has the burden to demonstrate to the court the asset's nonmarital character. *A & L, Inc. v. Grantham*, 747 So. 2d 832, 839 (Miss. 1999) (citing *Hemsley*, 639 So. 2d at 915). This burden goes beyond a mere demonstration that the asset was acquired prior to marriage. *Id.*

¶27.    Again, as James points out, Judy did not raise this issue at trial and is now procedurally barred from doing so. As stated previously, "[b]efore an issue may be assigned and argued in this Court, it must first be presented to the trial court." *Wilburn v. Wilburn* 991 So. 2d 1185, 1191 (Miss. 2008) (citing *In re: Hampton*, 919 So. 2d 949, 957 (Miss. 2006)). *See also Alexander v. Daniel*, 904 So. 2d 172, 183 (Miss. 2005).  As a result, Judy is procedurally barred from raising this issue as error for review before this Court.

13

**V. WHETHER THE CHANCELLOR ERRED IN FINDING THE FIRST MORTGAGE ASSUMED BY JAMES HAD A BALANCE OF $116,658 AND IN ORDERING JUDY TO BE RESPONSIBLE FOR THE SECOND-MORTGAGE/CREDIT-LINE LIABILITY OF $40,816 ON THE MARITAL HOME.**

¶28. Judy argues that the chancellor erroneously found the first mortgage to be in the amount of $116,658. She asserts that the first mortgage is actually in the amount of $75,872, a difference of $40,786 in James's favor. Given that the chancellor assigned Judy the $40,816 liability from the second mortgage, Judy argues that the miscalculation of the first mortgage resulted in an inequitable distribution of the marital debt.

¶29. James counters that a chancellor's discretion is exceedingly broad in matters of equitable distribution. *See Chamblee v. Chamblee,* 637 So. 2d 850, 864 (Miss. 1994). As such, in the absence of any manifest error, the marital debts were aptly classified and assigned by the chancellor.

¶30. Ample evidence supports Judy's claim that the first mortgage is $75,872. James's financial declaration lists the mortgage balance as $116,658; however, in his own testimony, James established that this was a combined total of the first and second mortgages. He further testified that the first mortgage was $75,872.

¶31. Judy contends in her reply brief, "One dollar of debt would decrease the party's value of assets being awarded by one dollar." However, as this Court has often stated: "One must bear in mind . . . that an equitable division of property does not necessarily mean an equal division of property. Mississippi is not a community property state." *Chamblee v.*

14

*Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994) (citing *Dillon v. Dillon*, 498 So. 2d 328, 330 (Miss. 1986); *Rives v. Rives*, 416 So. 2d 653, 657 (Miss. 1982)).

¶32. The record shows that, with all marital and separate property, James received $435,761 in total assets. Judy received $481,603 in total assets, after all marital and separate property had been classified and assigned to her by the chancellor. However, in the end, because we are reversing and remanding this case to the chancery court with instructions, based on our discussion and disposition of Issue VI, *infra*, we choose not to finally dispose of this issue; instead, we direct the chancellor to revisit this issue on remand, since the record before us reveals that the testimony of Judy and James was that the outstanding amount of the first mortgage was $75,872. Once the chancellor reconsiders this issue on remand, she may likewise consider adjustments, if any, that should be made in the total distribution of marital and nonmarital assets to each party.

## VI. WHETHER THE CHANCELLOR ERRED IN ORDERING JUDY TO PAY MONTHLY CHILD SUPPORT IN THE AMOUNT OF $750 AS WELL AS OTHER EXPENSES.

¶33. Judy contends that the chancellor erred in awarding James, the custodial parent, $750 per month in child support, because this amount is in excess of the statutory child-support guidelines. *See* Miss. Code Ann. 43-19-101(1) (Rev. 2009). According to Judy, the trial court erred in finding her "current adjusted gross income" to be in excess of $50,000 per year. She argues that the "income" reported on her financial declaration was not income, but rather the proceeds from the Northrop Grumman temporary-severance agreement that was scheduled to be exhausted in May 2007. According to Judy, the child-support award exceeds

the statutory guidelines found in Section 43-19-101, especially when considered with the fact that she was ordered to pay one-half of the child's automobile insurance, one-half of the child's health-insurance premium and noncovered medical expenses, and one half of the child's college expenses.

¶34. James counters that this severance pay had been described by Judy as compensation for the pay she would have received had she elected to remain employed for two more years, and then taken early retirement, and as such it is, in fact, income. Moreover, James references his financial disclosure, which shows Jamie's expenses to be $1,500 per month, or at least $750 per month for both parents. James avers that Judy's payment of monthly child support in an amount equal to one-half of Jamie's monthly expenses is a reasonable amount for Judy, given that she was making significantly more than James at the time she resigned, and given her earning potential.

¶35. Section 43-19-101(1) establishes a rebuttable presumption that one child should receive support in an amount equal to fourteen percent of the adjusted gross income of the noncustodial parent. Miss. Code Ann. § 43-19-101(1) (Rev. 2009). This presumption exists unless the chancellor makes a written, specific finding that the application of the guidelines would be unjust or inappropriate pursuant to Section 43-19-103, which addresses extraordinary needs or expenses of the minor child. Miss. Code Ann. § 43-19-101(2) (Rev. 2009). Furthermore, in cases where the annual adjusted gross income is more than $50,000 or less than $5,000, the chancellor shall make a written finding as to whether the application of the guidelines is reasonable. Miss. Code Ann. § 43-19-101(4) (Rev. 2009).

16

¶36.   As to the issue of child support, the chancellor made the following findings:

> . . . The evidence in this case shows that Judy's current annual adjusted income is in excess of $50,000. However, Judy testified that her income would decrease after May of 2007 pursuant to the terms of her severance package with Northrop Grumman. After May of 2007 Judy's income will consist of her monthly retirement benefit which at the time of trial was unknown. There was nothing at trial to show that Jamie had any extraordinary needs or expenses other than automobile insurance. Therefore, the Court finds a reasonable amount of child support from Judy would be $750.00 per month. Judy should also pay ½ of Jamie's automobile insurance premium . . . .

Judy also was ordered to reimburse James for the cost of the insurance premium on the policy James was maintaining for Jamie through James's employer, one-half of any uncovered medical expenses, and one-half of college expenses.

¶37.   As of 2006, Judy's "net monthly pay" on the financial disclosure submitted to the trial court was shown to be $6,549. However, her financial declaration reflects that this was her adjusted monthly income only through May 2007. Her testimony was that her earnings after May 2007 were unknown, as Updates LLC had produced no income for her. Judy's primary source of monthly revenue would be her retirement accounts, two accounts valued at $64,904. As the chancellor noted, it was unknown what the monthly payments from these accounts would be, nor were there any findings as to what, if any, dividends or interest Judy's other investments would produce on a monthly basis. Judy's reported investments, including the two retirement accounts, at the time of trial were valued at $354,807.55. She was ordered to pay James $91,458 of this amount.

¶38.   Mississippi Code Section 43-19-101(3)(a) gives numerous examples of what may be considered by the trial court as income:

17

Determine gross income from all potential sources that may reasonably be expected to be available to the absent parent including, but not limited to, the following: wages and salary income; income from self employment; income from commissions; income from investments, including dividends, interest income and income on any trust account or property; absent parent's portion of any joint income of both parents; workers' compensation, disability, unemployment, annuity and retirement benefits, including an individual retirement account (IRA); any other payments made by any person, private entity, federal or state government or any unit of local government; alimony; any income earned from an interest in or from inherited property; any other form of earned income; and gross income shall exclude any monetary benefits derived from a second household, such as income of the absent parent's current spouse . . . .

Miss. Code Ann. § 43-19-101(3)(a) (Rev. 2009).

¶39.   While $750 conceivably could be seen as a reasonable amount of monthly child support in light of Judy's significant assets, the statute plainly states gross income is determined from all "expected" and "available" sources of income. The Northrop Grumman severance package was no longer an available source of income after May 2007. The monthly income from Judy's retirement accounts, her "expected" income, was unknown at the date of divorce, as noted by the chancellor.  The chancellor does not appear to have based the award of child support solely on the fact that Judy's previous income was more than $50,000, as Judy suggests. This is evident in that, even when strictly applying the statutory guidelines of Section 43-19-101(1), fourteen percent of Judy's $6,549 monthly severance would be $916.86; therefore, $750 would be a downward departure from the guidelines. Thus, it is unclear what source of revenue serves as the basis of the trial court's award of child support.

18

¶40.    James argues that, even if the chancellor's award was not based on actual income, this Court should affirm it, because earning capacity, rather than actual income, has been considered by courts when awarding child support. A chancellor can base child support on the parent's potential earning capacity. ***Suber v. Suber,*** 936 So. 2d 945, 949 (Miss. Ct. App. 2006) (citing ***White v. White***, 722 So. 2d 731, 734 (Miss. Ct. App.1998)). In ***White***, 722 So. 2d at 734 (Miss. Ct. App. 1993), the Court of Appeals held "where temporary financial reverses create an unreliable measure for an award of child support, the chancellor may in his discretion predicate an award on reasonable earning capacity." ***White*** addressed whether an unemployed father's child support must be based on his unemployment benefits or his earning capacity. ***Id.*** at 733. The Court of Appeals rejected Mr. White's argument, and held that an award of child support based on earning capacity was not manifest error. ***Id.*** at 734.

¶41.    The current case is distinguishable from ***White*** in that the chancellor in ***White*** made on-the-record findings that an upward departure from the guidelines was warranted based on the fact that Mr. White's earning capacity was higher than his actual monthly income, i.e., unemployment benefits. *See **id.*** at 733. The Court of Appeals agreed, based on these on-the-record findings. ***Id.*** at 734. The guidelines must apply "unless the judicial or administrative body awarding or modifying the child support award makes a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate . . . ." Miss. Code Ann. § 43-19-101(2) (Rev. 2009). Moreover, while the chancellor could have based the child support on Judy's earning capacity rather than her actual earnings, no

19

on-the-record findings were made that Judy's earning capacity was the basis for the $750 award of monthly child support.

¶42. As a result, we find this issue must be reversed and remanded for further proceedings consistent with this opinion. Upon remand, a determination of child support must be made based on Judy's circumstances from the time of divorce until remand. Moreover, given that much time has passed since the divorce on October 10, 2007, a determination should be made as to the amount of child support that is appropriate based on Judy's current circumstances.

## CONCLUSION

¶43. For the reasons stated, the chancellor's judgment is affirmed in part and reversed in part; and this case is remanded to the Chancery Court of Jackson County for further proceedings consistent with this opinion.

¶44. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WALLER, C.J., GRAVES, P.J., RANDOLPH, LAMAR AND CHANDLER, JJ., CONCUR. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., AND LAMAR, J.; WALLER, C.J., GRAVES, P.J., AND DICKINSON, J., JOIN THIS OPINION IN PART. DICKINSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY KITCHENS, J. PIERCE, J., NOT PARTICIPATING.**

**KITCHENS, JUSTICE, SPECIALLY CONCURRING:**

¶45. I concur with the majority opinion in its analysis and its result, but I write separately to explain why I join, in part, Justice Dickinson's separate opinion. I agree with his conclusion that the determination of child support is and should be a judicial matter.

20

However, until this Court chooses to exercise its rule-making power in this regard, our chancery courts are bound by the guidelines that have been established by the legislature.

¶46.    Mississippi adopted statutory child-support guidelines in response to the federal Family Support Act of 1988.  Deborah H. Bell, *Bell on Mississippi Family Law* § 10.01[1][c] (2005) (citing 42 U.S.C. §§ 651-669 (2000)).  The federal statute provides, in pertinent part:

> Each State, as a condition for having its State plan approved under this part, must establish guidelines for child support award amounts within the State. The guidelines may be established *by law or by judicial or administrative action*, and shall be reviewed at least once every 4 years to ensure that their application results in the determination of appropriate child support award amounts.

42 U.S.C.A. § 667(a) (emphasis added).  Thus, child-support guidelines are a prerequisite to qualifying for federal funds, but such guidelines "may be established . . . by judicial . . . action." *Id.*  As Justice Dickinson correctly observes in his separate opinion, the Mississippi Constitution places matters of child support squarely within the power of the chancery courts. Miss. Const. art. 6, § 159.  But, to hold Mississippi Code Section 43-19-101 unconstitutional without providing an adequate substitute would undermine an established system designed to provide financial support to children.  Such a ruling from this Court would adversely affect thousands of judgments and threaten much needed federal funding.

¶47.    Therefore, until this Court has promulgated substitute guidelines, the chancery courts should be guided by the statute.  In ***Thurman v. Thurman***, 559 So. 2d 1014, 1017 (Miss. 1990), we recognized that "a judicial award making a written or a specific finding different from the guidelines defeats the presumption and leaves, as this Court believes the Legislature

21

intended in the normal case, child support determination in the hands of the customary chancery court proceeding." In other words, the chancery court is not absolutely bound to adhere to the guidelines, provided it makes a thorough on-the-record determination, based on the evidence, for any upward or downward departure. *Brocato v. Brocato*, 731 So. 2d 1138, 1145 (Miss. 1999). Because the chancellor did not make any such finding in the instant case, the majority is correct in reversing on that issue.

**CARLSON, P.J., AND LAMAR, J., JOIN THIS OPINION. WALLER, C.J., GRAVES, P.J., AND DICKINSON, J., JOIN THIS OPINION IN PART.**

**DICKINSON, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶48. The constitutional duty and authority to decide appropriate child support rests with the courts.[1] So the Legislature may not constitutionally dictate a judicial award of child support,[2] and may not interfere with a chancellor's mental processes in deciding cases.[3] Today, the majority reverses a child support award – not because it is unreasonable – but because in reaching his conclusion the chancellor did not follow the legislative recipe[4]. Because I would affirm the chancellor in all respects, I therefore concur in part and dissent in part.

---

[1]Miss. Const. art. 6, §§ 144, 159.

[2]Miss. Const. art. 1, § 2.

[3]*Thurman v. Thurman*, 559 So. 2d 1014, 1018 (Miss. 1990) ("[T]he guidelines are relevant and may be considered by a chancellor as an aid, but the guidelines may not determine the specific need or the specific support required.").

[4]*See* Miss. Code. Ann. § 43-19-101(1) (Rev. 2009).

22

**KITCHENS, J., JOINS THIS OPINION IN PART.**